My name is John Westrick. I represent the appellants, PSC Funding, and Timothy Oliver. With the court's permission and cooperation, I've asked for three minutes of rebuttal time. Thank you. I'm going to start with testimony below from the principal of Meecorp. We know how to evaluate things, and we make our own determination. That was the language of Mr. Edry at trial. This is a diversity case. The law of Minnesota applies. And the law of Minnesota is very clear. Where there is a commercial transaction and one party does an independent investigation, then there can be no reliance. And without reasonable reliance, there can be no fraud and no damages for fraud. The proximate causation and the reliance issue come together. Here, there's no question that the valuations and projections that were exhibits below were reviewed by Meecorp prior to closing the transaction. There was testimony that Meecorp was aware that Mr. Oliver did not own the, or rather was unable to pledge this additional collateral himself, that permission had to be done. There's discussion of it in the transcript. There's all, yes? Did the other side knew about that? Yes, Your Honor. What's the site for that? The site to that is? You're talking about the Gandolfo? I'm discussing, Your Honors, the exhibits 11 through 25. If you go to the transcript at page 316, there was testimony by Mr. Mundy. We were very concerned that Tim Oliver did not own directly the economic interests which he had indicated. Yet before or after he made the representations that he had ownership interest. Well, it was, really it doesn't matter, but it was done before closing. But they were concerned and then they relied on his statements that he had an interest in it. It seems to me it does matter.  And the documents made clear that there were certain things that had to be done in order for one to be able to pledge them. That was they needed the permission of the other members of the LLCs or entities besides Mr. Oliver. Testimony that he was, in fact, that anyone was, in fact, aware of that. Yes, at page 316, they were aware of it. Mr. Mundy discusses that. And then he got instructions from the principal of MECorp that I instructed Mr. Mundy if he doesn't get what he wants and what he's supposed to get, he's not to close the loan. Or as, again, Mr. Edry said, the conclusion that Mr. Modry had was Mr. Oliver, and I'm saying Mr. Oliver instead of he owns all of these. He owns what he says he owns, but he doesn't own it directly. He owns it through different corporations. And if we take an interest in those entities, obviously, you'll be covered. We do the math. But, yes, legally, that's the way to do it. And so what happened here is there was an independent evaluation done of what exactly Mr. Oliver and his various entities held. Prior to closing the loan, MECorp was aware of the fact that these items could not be pledged. So you're saying if a defendant in a fraud claim hides the information well enough that that's good enough to avoid liability? Well, no, and I don't think there's been an allegation that it was hidden, Your Honor. But if an independent evaluation is done, remember, Mr. Oliver, this was an arm's-length transaction. He had no duty to provide any information absent what he was asked for. That is the law in Minnesota, and that's the law that applies here. And when one does an independent examination in a commercial case, one loses the ability. But they have been able, in that type of investigation, to discover the ownership of the limited partnerships? Yes. As a matter of fact, again, that's Exhibits 11 through 25. They show the membership interests and demonstrate that Mr. Oliver did not have personal ownership of and that there were obstacles to him pledging the assets without the input of other persons. Well, was there really hard information available about the assets of these entities? Yes, I believe there were, Your Honor. I was, fortunately or unfortunately, I was not trial counsel. So I'm looking at the record as you do, and I believe, looking at the record, that that is so. That Exhibits 11 through 25 make that clear. There were the, quote, projections, end quote, or revenue prognications that were attached to Exhibit 55. But again, MECorp did its own independent evaluation of that, and the quote that I started out with was regarding those evaluations. They based on their own experience and their own analysis of the documents. So prior to the closing, MECorp was aware of these obstacles to Mr. Oliver being able to pledge these assets absent permission of the other members. Wasn't there also the affirmative evidence that Mr. Oliver represented that he had ownership interests? He did represent that he had ownership interests, but that he had them through his disclosures, through these various entities, and not, and as again, the test. That turned out, though, to be false, right? Well, he owned them through the various entities. That is true. He did not own them outright, but again, the evidence was clear below this. They were aware of this, MECorp was, prior to the closing. That's, again, at the transcript at 316. And so as a result of that, we do not believe that there was reasonable reliance. The law of Minnesota seems very clear on that. The Valspar case says it. There's a 50-year-old decision of this court that can be read to say the same thing about both projections and about investigation, which is the Lack case versus Ralston-Perina. This is more than just projections, isn't it? This is whether or not he had an ownership interest that he could pledge. If I may, real quick, there are two aspects, as I understand it, to the fraud. One were these projections or revenue estimates, and the second is the ownership interest. So I'm not just saying that it was limited to one or the other. The ownership interest, the documents below, made clear what the ownership interests were, and MECorp had the ability and did do an investigation and asked its legal counsel to be able to draft an agreement that would protect it, and that if they couldn't draft an agreement to protect it, they should not close the loan. How could MECorp have discovered that the limited partnerships forbade pledging? Well, because it's in the member control agreements that they had. And that would have been evident to them? Yes. I'm into my rebuttal time. Does the court have further questions? How long did they have those documents? I cannot tell you from the record because I was not trial counsel. Seeing that, I will return for rebuttal. Thank you. Okay. Mr. Rosen. May it please the Court. In answer to Your Honor and Judge Smith's question, MECorp was never, ever provided with the limited partnership agreements. There were member control agreements that were provided, but the core of the fraud is, of one of the two principal frauds that were committed, was that they were providing documents that related to companies of identical name to the companies that owned the properties, but not the companies that owned the properties. So if the court were to look at the exhibit that's attached to the loan agreement, and I believe it's exhibit 55 as I stand here right now, and it will list several names of properties. And it lists them all by different names, Red Cedar and Green Streets and such names. And all of those properties, with each one of those properties, there was a representation as to what Mr. Oliver's interest was. There was a representation that Mr. Oliver owned an interest in two pieces. Piece number one was that he owned it through PSC funding, and you'll see on the exhibit there's a notation that says 19%, because Mr. Oliver owned 19% of PSC funding. And there's a representation of value. Then right next to it, in another column, is a representation that Mr. Oliver owned twice as much as what he owned through PSC funding, that he owned twice as much through an, quote, Oliver entity. A key element of the fraud, and by the way, and this is all stapled to the loan agreement, that is the commitment to loan, signed by Mr. Oliver, signed by PSC funding. One of the key elements of the fraud is when there was a representation that he owned through this other Oliver entity, that was a 100% lie. There was no interest whatsoever that he owned, at least no financial interest. There was some governance and some other things, but there was no financial interest that he owned whatsoever other than what he owned through PSC funding. Now, proceed to a short time later, and they're getting ready for closing, and they're looking at documentation, and the lawyer from E-Corp says, would you please now provide me with the information on the different entities that own these properties, the properties that were listed in that exhibit, that exhibit that was attached to the loan commitment agreement? Well, what they do is they provide documents that relate to 13 entities that have the same names as what are on that document, right? Because that document, that original document, didn't distinguish between limited partnership and limited liability company. So what you had was, let's say it was, and I confuse these names of these companies so often, but let's say one was called Green Streets, and it was so similar, but let's call it Green Streets. There would have been Green Streets Limited Partnership, which actually owned the property, and Green Streets LLC, that owned one-tenth of 1% of Green Streets Limited Partnership. Well, they provide, please provide us with all of the ownership documents relating to the companies that own these properties. They provide the ownership documents of the companies of identical names that own one-tenth of 1% of the companies that own the properties. Now, those companies, because they were LLCs, that is, the companies that owned one-tenth of 1% were LLCs, those they provided member control agreements for, which is what my esteemed counterpart has referred to. But what would have talked about the restrictions on transfer, those would have been the governing documents that were actually being asked for, the governing documents of the companies that actually owned the properties, and those were not provided, never provided. None of the documents provided to your client reflected the inability to pledge. That's correct with one exception. One of those partnerships had a different name than what was provided on that exhibit to the loan commitment agreement. And for that different one, the lawyer says, wait a minute, you haven't given me any document that relates to this piece of property. Why there? There was a difference between the name of the LLC owner and the name of the limited partnership owner. So for that one, they actually provide the limited partnership information to which the lawyer says, sorry, I mean, you know, this won't work for us because you don't have what you need. But for all of the other 13, they perpetuated the fraud and made and caused MeCorp to believe that these were all of the companies that owned the properties. These being then the so-called, were represented as being the Oliver entity, the entities through which Tim Oliver owned double what he owned through PSC. And that, of course, by it also was false. It was false because it was one-tenth of one percent. He owned whatever percentage of one-tenth of one percent. I mean, at some point you get into the thousands of percentages and it's utterly meaningless. So the bottom line is they did not ultimately give those. And it's also important to know that, and I think there was a representation made, and I think the representation from counsel was just an honest mistake. There was a representation made that there was actually some other ownership by Tim Oliver of these entities, in these properties, but there was none. The only ownership was PSC. Every other representation that was contained in those in that Exhibit 55 was a false representation. It's worth noting, by the way, at the outset of counsel's argument, there was a quotation from two different quotations from testimony, one from Michael Edry, the principal of MeCorp, and one from William Munday, the MeCorp lawyer. But both of those quotes are quotes out of context, if I may say. The Edry testimony that says, look, we know how to do our own valuations, the testimony actually was we took their representations of income and then we do our own conclusions of what value is. So there was a column with income and a column with value. He says, look, the value column, we took their representations of income, made our own determinations of value, and he testifies sometimes based on that income we said the value was less, sometimes we said the value was more, but it was sufficient to support a loan. But he never says that they did their own determinations of what the income was, and he absolutely says that he relied.  What about reliance? And so Mr. Edry says we relied, and it's in the actually the same testimony that was quoted, but just a different sentence, we relied on their representations of what the income of this property was. And then we did our own valuation conclusions, but we relied on their representations of the income. Mr. Rosen? Yes, Your Honor. The appellant here in this case is PSC of Two Harbors, but was it the judgment against PSC LLC, and what's the relationship between those and why? Your Honor, the appellant here as we sit here today is PSC funding. The borrower was PSC of Two Harbors. The original applicant for the funding was an affiliated entity, PSC funding. On the eve of closing, they changed the identity of the borrower to PSC of Two Harbors. But the fraud judgment is against PSC funding and Oliver because they actually provided all of the information. PSC funding is owned 20% by Oliver and 80%, I'm giving approximate numbers, I think it's 19 point some percent. And the other 80% by several others. PSC of Two Harbors was owned 50% by Tim Oliver. Does that answer the court's question? Well, it really doesn't clear up in my head why the particular party is the one who's chosen to appeal. So the appellants here are Tim Oliver, who committed the fraud by providing the information, and PSC funding that committed the fraud by providing the information. Now, PSC of Two Harbors also did, but PSC of Two Harbors really, I think, ultimately didn't appear because it had no people through whom it could act in order to accomplish that. Moreover, PSC of Two Harbors had- Two Harbors, that's who's- So I think to appeal the fraud judgment for PSC of Two Harbors would have been a meaningless affair. The trial really was dealing not with the liability on the underlying notes, which was PSC of Two Harbors liability, but rather with the fraud that induced MeCorp to lend, and that fraud was committed by PSC funding. My question's probably better addressed to Mr. Westrick as to why he's representing Two Harbors here today. Yes, Your Honor. So funding and Oliver were not on the note and guarantee judgment, right? Oliver is on the guarantee judgment, yes. So- Not PSC funding? But not PSC funding. The judgment against PSC funding is for fraud. The judgment against Oliver is for fraud and the guarantee. Then there was the Gandalf entities- The judgment amounts are the same, aren't they? Well, actually, the guarantee, because it was only a 50% guarantee, it was for less. So there was another 50% guarantor that's not a party to these appeals that, for example, only has a 50% judgment. The only thing before us is the fraud issue, though. The only thing here is the fraud issue. That is the only issue on which Mr. Oliver and PSC funding have appealed, and they've only appealed on whether or not there was sufficient evidence to be able to sustain a finding of fraud below. Thank you. Thank you, Your Honors. I will answer your question, Judge Smith. PSC of Two Harbors LLC is the appellant because that is who I was instructed to file the appeal on. I was not trial counsel and prior counsel, and Mr. Oliver instructed me that that was the party for whom I was to file the appeal on behalf of. And so that's the answer to the question. Counsel, again, he lived this. I'm not quite so sure that the record supports what he has. My review of the record is different. I'm looking at the transcript at page 384. It does discuss that they looked at other documents, that they looked at information that came from people besides Oliver. But what's also important is they hired counsel to look at this. Counsel asked for documents. He got documents. He performed an independent investigation. The law of Minnesota, the Valspar case talks about this. Some of the other cases talk about this. If you perform an insufficient investigation as opposed to a cursory investigation, there still isn't any reliance. So you have to show something more than we did not get the information. Are there any more questions? Well, if they withheld documents that would have reflected the inability to pledge, wouldn't that be sufficient? The court is using the term withheld. If you don't ask for them because there was no fiduciary duty, this is a commercial transaction. You cannot withhold documents that you're not required to turn over without being asked. That is the difference here. If there are no more questions, then I'll cede the rest of my time. My client and I thank the court for its time and attention to the matter. Thank you. Thank you both. We'll move on to Rose v. Flurry.